DECISION
This matter is before the Superior Court on remand from the Rhode Island Supreme Court. In its remand, the Supreme Court directed the Superior Court to treat the motion of defendant Department of Children, Youth and Families as a motion for summary judgment.
 Facts/Travel
The plaintiffs Vincent DiBattista and Robin DiBattista (the DiBattistas or plaintiffs) were licensed by DCYF as foster-care parents until January 10, 1995.[1] At that time, the Department of Children, Youth and Families (DCYF)[2] revoked plaintiffs' foster-care license due to the plaintiffs' behaviors which DCYF considered inappropriate for state-licensed foster-care parents.[3] The plaintiffs, pro se, pursued an appeal of the revocation through the DCYF administrative appeals process and were granted hearings in April and May of 1995.[4] The administrative hearing officer upheld DCYF's revocation of the plaintiffs' foster-care license in his June 5, 1995 decision.[5]
Pursuant to G.L. 1956 § 8-10-3 (e)[6] and § 42-35-15 of the Administrative Procedures Act (APA), the plaintiffs appealed the matter to the Family Court for administrative judicial review.[7]
Subsequently, DCYF filed a motion to dismiss the appeal because the plaintiffs failed to allege any statutory grounds for relief pursuant to the APA.[8] After a hearing on July 28, 1995, although without the benefit of the administrative hearing record, a Family Court justice granted DCYF's motion.[9] However, the justice informed the plaintiffs of their right to appeal.[10] On or about September 8, 1995, a decree granting DCYF's motion to dismiss was filed.[11] According to the certification thereon, a copy of the decree had been mailed to the DiBattistas on August 10, 1995.[12] The decree was signed and dated by the justice on or about August 10, 1995.[13] The plaintiffs did not appeal the dismissal; however, on or about October 25, 1995, they filed a "motion to vacate the order dismissing [their] appeal."[14] A justice of the Family Court initially heard the plaintiffs' motion on November 8, 1995 and ordered memorandum within thirty days.[15] The DiBattistas filed a motion for contempt based upon DCYF's failure to file a memorandum within thirty days.[16]
On January 4, 1996, another justice of the Family Court, after review of the file, heard the plaintiffs' motion for contempt and the pending motion to vacate.[17] During the hearing, the parties addressed the absence of a transcript of the administrative hearing.[18] Ultimately, the Family Court justice denied the motions and regarding the motion to vacate, specifically found no grounds for relief under Rule 59 or 60.[19]
DCYF drafted a decree embodying the order from the January 4, 1996 ruling of the Family Court justice,[20] and according to the certification thereon, a true copy was mailed to the DiBattistas on January 11, 1996.[21] Apparently, that decree was not signed by the hearing justice or entered by the clerk.[22] On July 28, 1997, the plaintiffs filed a motion for entry of judgment, pursuant to Rule 58, "to enter judgment for the defendant, DCYF, in this matter having been heard on July 28, 1995 and an order entered granting the defendants [sic] Motion to Dismiss."[23] Said motion, initially scheduled to be heard on August 4, 1997,[24]
apparently and inexplicably was heard on June 3, 1998.[25] A decree denying the plaintiffs' motion to vacate entered on June 4, 1998.[26]
On June 23, 1998, within twenty days of that entry, the plaintiffs, pro se, petitioned our Supreme Court for Writ of Certiorari and Trial De Nova [sic].[27] On October 22, 1998, the Supreme Court entered an order summarily denying plaintiffs' petition.[28]
On June 17, 1996, plaintiffs, pro se, filed in the Superior Court a separate action, entitled "Complaint for Civil Rights Violations." The thirty page complaint against DCYF and various state agents, including two Family Court justices alleged:
 "a host of civil rights violations as well as conduct in contravention of a litany of civil and criminal provisions of the Rhode Island General Laws. It also set forth numerous causes of actions, including unlawful revocation of their foster-parents' license, defamation, conspiracy, obstruction of justice, and judicial misconduct. Among other charges, plaintiffs suggested that DCYF had denied them their due-process rights by revoking their foster-care license without the benefit of a pre-revocation hearing. . . . And plaintiffs' prayer for relief sought, inter alia, to have their foster-parents' license restored and their foster care [sic] children returned."[29]
Subsequently, DCYF filed a motion for a judgment on the pleadings pursuant to Rule 12(c) of the Superior Court Rules of Civil Procedure.[30] DCYF argued that most of the plaintiffs' claims were barred by the doctrine of res judicata, and, additionally, that the judicial misconduct claims against the Family Court justices were barred by the doctrine of judicial immunity. A Superior Court justice, after a hearing, agreed with DCYF that the plaintiffs were re-asserting the same issues presented to the Family Court and granted the motion to dismiss on res judicata grounds.[31] Plaintiffs timely appealed the judgment of the Superior Court dismissing their complaint to our Supreme Court.[32]
The Court, having determined that:
 "the Superior Court erred in giving res judicata effect to any Family Court judgment in light of the patchy record and pleadings presented for its consideration, noted that the record upon which the Superior Court ruled contained no evidence of any final judgment of the Family Court in the earlier action, nor were there any transcripts or decisions embodying its rulings. . . ."[33]
Further, the Court decided that the defendants' 12(c) motion "should more appropriately have been treated as a motion for summary judgment."[34] Accordingly, the court vacated the judgment of the Superior Court and remanded the case, directing the Superior Court to treat the defendants' motion as a motion for summary judgment after providing each party a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56."[35]
In February of 1999, after firm encouragement from this Court, the plaintiffs obtained the assistance of counsel. Thereafter, the defendants filed the present motion for summary judgment to which the plaintiffs object.[36] After hearing the parties' oral arguments, this Court took the case under advisement and requested additional memoranda on a particular issue regarding damages. Having received the requested memoranda, this decision follows.
Such additional facts, as are pertinent to this decision, shall be set forth in the discussion that follows.
 Summary Judgment
"[S]ummary judgment is a drastic remedy that should be cautiously applied." Boland v. Town of Tiverton, 670 A.2d 1245, 1248 (R.I. 1996). When a trial justice is ruling on a motion for summary judgment, the only question before him or her is whether there is a genuine issue of material fact which must be resolved. Rotelli v. Catanzaro, 686 A.2d 91, 93 (R.I. 1996). Summary judgment is proper "only if an examination of the admissible evidence, undertaken in the light most favorable to the nonmoving party, reveals no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Visconti 
Boren Ltd. v. Bess Eaton Donut Flour Co., 712 A.2d 871, 872 (R.I. 1998) (per curiam) (citing Rotelli v. Catanzaro, 686 A.2d 91, 93 (R.I. 1996)).
A party opposing a motion for summary judgment carries the burden of "proving by competent evidence the existence of a disputed material fact and cannot rest on the allegations or denials in the pleadings or the conclusions or on legal opinions." Macera Brothers of Cranston, Inc. v. Gelfuso Lachut, Inc., 740 A.2d 1262, 1264 (R.I. 1999) (per curiam) (citing Manning Auto Parts, Inc. v. Souza, 591 A.2d 34, 35 (R.I. 1991)). "The opposing party may not rest upon allegations contained in the pleadings alone to establish a genuine issue of material fact." Sisters of Mercy v. Wilkie, 668 A.2d 650, 652 (R.I. 1996) (citing Nichola v. John Hancock Mutual Life Insurance Co., 471 A.2d 945, 948 (R.I. 1984). If the opposing party cannot establish the existence of a genuine issue of material fact, summary judgment must be granted. Grande v. Almac's, Inc., 623 A.2d 971, 972 (R.I. 1993).
In the instant matter, the defendants argue that the plaintiffs' complaint should be dismissed with prejudice based on the doctrines of res judicata and collateral estoppel. The plaintiffs, however, counter that several issues of material fact are in dispute[37] and further that the doctrines of res judicata and collateral estoppel do not control.
 Res Judicata
The defendants argue that the plaintiffs' claims are barred by the doctrine of res judicata because the complaint asserts the same issues, specifically the license revocation, against the same parties as finally adjudicated in the first proceeding. They argue that the plaintiffs are attempting to cloak the previously litigated issue of the license revocation in "misapplied constitutional and criminal law."[38]
The plaintiffs counter that the doctrine of res judicata does not control for several reasons, including (i) the issue of license revocation was never adjudicated on the merits, (ii) the issues raised in this action could not have been raised in the Family Court, (iii) the DiBattistas were not afforded the same rights as they are entitled to in this action, (iv) the Family Court lacked jurisdiction to award the DiBattistas monetary damages or injunctive relief and (v) the application of the doctrine of res judicata would work a manifest injustice.
The well-settled doctrine of res judicata "renders a prior judgment by a court of competent jurisdiction in a civil action between the same parties conclusive as to any issues actually litigated in the prior action, or that could have been presented and litigated therein." DiBattista, 717 A.2d at 642 (citing ElGabri v. Lekas, 681 A.2d 271, 275 (R.I. 1996)). "[A] party defeated in one action cannot maintain a second action based on a ground which could properly have been, but was not, set forth and relied upon in the former action." ElGabri, 681 A.2d at 275 (quoting Wholey v. Columbian National Life Ins. Co., 69 R.I. 254, 262,32 A.2d 791, 795 (1943)). Notably, "for an issue to be res judicata, it is not necessary that the prior judgment be right. A judgment may be erroneous in law, but if it becomes final it is still binding and conclusive as between the parties upon the question." Lopes v. Mallory,108 R.I. 694, 698, 279 A.2d 450, 452 (1971) (citations omitted). "Moreover, for purposes of res judicata, even claims that could have been raised in a lawsuit but were not are still foreclosed from later litigation if they are derived from the same transaction or series of connected transactions." DiBattista, 717 A.2d at 641 n. 4 (citing ElGabri, 681 A.2d at 176). The doctrine "serves as an `absolute bar to a second cause of action where there exists identity of parties, identity of issues, and finality of judgment in an earlier action.'" Garganta v. Mobile Village, Inc., 730 A.2d 1, 5 (R.I. 1999) (quoting ElGabri, 681 A.2d at 275).
After DCYF revoked their license on January 10, 1995, the plaintiffs pursued their post-deprivation remedies of administrative and judicial administrative appeals. The DCYF hearing officer articulated the actions from which the plaintiffs appealed and focused the appeal primarily on the issue of the license revocation.[39] Subsequently, the plaintiffs asserted their claims of unlawful revocation, including due process violations before the Family Court. Review of the July 28, 1995 hearing transcript indicates that the plaintiffs asserted their contentions that the revocation was unlawful and that they were denied lawful process.[40]
After the plaintiffs raised before the Family Court the rights alleged to have been infringed, retaliation and the related transactions, it ruled.
As our Supreme Court stated upon review of the Superior Court's prior dismissal of this action, the party seeking the benefit of res judicata has the burden to "plead and prove the judgment upon which it relies." DiBattista, 717 A.2d at 642. The decree granting DCYF's motion to dismiss was signed and dated by the trial justice on August 10, 1995, and although undated, the clerk's signature is beside the signature of the trial justice. The certification thereon indicates that a copy of the decree was mailed to the plaintiffs on August 10, 1995. The date-stamp on the decree is September 8, 1995, and the docket sheet reflects that the decree was entered on September 8, 1995.[41] The plaintiffs did not move under Rule 59 to alter the judgment or for a new trial at any time, including after September 8, 1995. Once the dismissal order entered in the Family Court, the plaintiffs' further recourse was by way of appeal to our Supreme Court.[42] Such an appeal would have afforded the opportunity for plaintiffs to assert any errors of law made by the Family Court justices.[43] Because the plaintiffs did not appeal the decree of the Family Court's dismissal of their action to the Supreme Court, it became a final decision and was binding on both the DiBattistas and the DCYF.[44]
The plaintiffs filed their motion to vacate the order that dismissed their appeal on October 25, 1995. The judgment pertinent to the motion to vacate entered on June 4, 1998.[45] Although the plaintiffs applied for Writ of Certiorari and Trial de Nova [sic] within twenty days of entry of the June 1998 decree denying plaintiffs' motion to vacate the July 28, 1995 dismissal,[46] the Supreme Court summarily denied the plaintiffs' petition.[47] Ultimately, the DCYF's revocation of the plaintiffs' license was upheld. Accordingly, the matter has achieved finality.
This Court finds that the plaintiffs' claims regarding the allegedly unlawful revocation derive from the same transactions as those raised by the plaintiffs before the Family Court. Constitutional issues, even those not raised at the administrative level, are not precluded from litigation during an administrative appeal pursuant to the APA.[48] To the extent that the plaintiffs attempt to re-litigate before this Court the DCYF's revocation of their license and related transactions, the doctrine of res judicata is an absolute bar. Further, the plaintiffs' claims regarding the change of social worker, breach of the home boarding agreement and errors of the Family Court justices[49] are also barred.[50]
However, the administrative proceedings were of limited substantive and remedial scope. Claims that could not have been properly asserted and litigated before the Family Court, including those based on statutory or common law, are not precluded by the doctrine of res judicata. Accordingly, the doctrine of res judicata cannot be applied, as defendants urge, to dismiss this entire action. The plaintiffs' tort claims of defamation, emotional distress and conspiracy survive the res judicata bar.[51]
 Collateral Estoppel
The defendants argue, relying on their reasoning for res judicata to bar this action, that the doctrine of collateral estoppel similarly bars it. Whereas res judicata prevents a party from re-litigating the same claim against the same party in a separate action, collateral estoppel precludes re-litigation of the same issue against the same or a different party. It is well-settled that for the doctrine for collateral estoppel to apply, "there must be an identity of issues; the prior proceeding must have resulted in a final judgment on the merits; and the party against whom collateral estoppel is sought must be the same as or in privity with the party in the prior proceeding." Commercial Union Ins. Co. v. Pelchat, 727 A.2d 676, 680 (R.I. 1999) (quoting State v. Chase,588 A.2d 120, 122 (R.I. 1991)). Our Supreme Court has "subdivided the first requirement, identity of issues, into three factors: (1) the issue sought to be precluded must be identical to the issue determined in the earlier proceeding, (2) the issue must actually have been litigated in the prior proceeding, and (3) the issue must necessarily have been decided." E. W. Audet Sons, Inc. v. Fireman's Fund Ins. Co.,635 A.2d 1181, 1186 (R.I. 1994) (citations omitted). The doctrine "directs that an issue of ultimate fact that has been actually litigated and determined cannot be re-litigated between the same parties or their privies in future proceedings." Commercial Union, 727 A.2d at 680 (citation omitted).
The plaintiffs contend that the doctrine does not bar their action because two essential elements are lacking: identity of issues and a prior proceeding resulting in a final judgment on the merits. This Court agrees regarding plaintiffs' claims of defamation, emotional distress and conspiracy. Accordingly, they are not barred by the doctrine of collateral estoppel.
 Defamation
In their complaint, plaintiffs assert defamation claims related to (i) a DCYF official's statement to all relative DCYF social workers, "Don't bother to come to arranged meeting on January 6, 1995 unless you have something negative to say about the plaintiffs";[52] (ii) "In implementing the unlawful revocation, the children were removed immediately from their schools with police escort, giving way to the belief of extreme wrongdoing on the part of the plaintiffs and causing . . . great defamation of character";[53] and (iii) "[a] letter was sent in its official capacity, representing DCYF's revocation of plaintiffs' foster-care license to the Child Advocates Office. [sic] Defaming our character."[54]
It is well-established that the court shall decide whether a statement contains a defamatory meaning. Swerdlick v. Koch, 721 A.2d 849, 859 (R.I. 1998) (citations omitted). To be successful in a defamation action, a plaintiff must prove `"(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) damages, unless the statement is actionable irrespective of special harm.'" Id. at 859-60 (citations omitted). The first element is satisfied by "[a]ny words, if false and malicious, imputing conduct which injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or bring him [or her] into public hatred and contempt." Id. at 860 (citation omitted). In its evaluation, the court "must examine the alleged defamatory words in the context of the publication in which they appear as a whole, and give the words their plain and ordinary meaning in the community in which they are published." Id. (citations omitted). The "decisive inquiry, however, is what the person . . . to whom the communication was published reasonably understood as the meaning intended to be expressed." Id. (citation omitted).
To prevail against the motion for summary judgment, the plaintiffs carry the burden of "proving by competent evidence the existence of a disputed material fact and cannot rest on the allegations or denials in the pleadings or the conclusions or on legal opinions." Macera Brothers of Cranston, Inc., 740 A.2d at 1264. Regarding their first allegation of defamation, the alleged statement by a DCYF official to involved DCYF social workers, this Court, having examined the evidence in the light most favorable to the DiBattistas, finds that the plaintiffs have not proven the existence of a disputed material fact supporting their contention of defamation. Further, this Court does not find the assertion to be defamatory of the plaintiffs. The plaintiffs' second and third allegations of defamation result from revocation of their foster-care license, specifically removal of the children by police escort upon revocation of plaintiffs' license and a letter sent by DCYF to notify the Child Advocate's Office of the revocation of plaintiffs' foster-care license. The plaintiffs have not proven the existence of a material fact in dispute regarding the status of their license as revoked at that time.[55] Because the license had been revoked, this Court finds that the alleged defamatory material does not communicate or imply any false facts. Further, statements which are substantially true, even if "exaggerated or slightly off the mark factually," are not defamatory. Swerdlick, 721 A.2d at 861. Accordingly, this Court finds that the plaintiffs' second and third defamation claims also fail as a matter of law.
 Emotional Distress
In their complaint, the plaintiffs assert that the defendants' actions inflicted emotional distress. Specific actions cited by the DiBattistas include (i) "in implementing the unlawful revocation, the children were removed immediately from their schools with police escort, giving way to the belief of extreme wrongdoing on the part of the plaintiffs, and causing great extreme emotional distress";[56] (ii) included in their claim for conspiracy to obstruct justice pursuant to G.L. 1956 §11-1-6, plaintiffs complain that they "suffered additional pain and suffering from an extreme emotional relapse when their access to justice was obstructed and the death of hope for the reunification of the foster family was the outcome";[57] and (iii) as part of a claim of conspiracy to violate plaintiffs' civil rights under G.L. 1956 § 11-1-6, "extreme pain and suffering was [sic] caused to the plaintiffs by the denial of their civil rights and their right to seek and obtain justice through provisions in the state code of laws"[58] and further that "the plaintiffs have suffered extreme emotional distress and pain over the last year and a half."[59] Recently, our Supreme Court found that hearing justices ruling on summary judgment motions in a matter involving oppression within a closely-held corporation "`missed the forest for the trees' in their inquiry, and instead focused exclusively on each count, to the exclusion of an appropriate broader inquiry into an alleged pattern or series of acts. . . ." Hendrick v. Hendrick, 755 A.2d 784, 792 (R.I. 2000). In light of this instruction, this Court finds that plaintiffs assert, perhaps inartfully, a claim for emotional distress. Nevertheless, to the extent that the plaintiffs assert a claim for negligent or intentional infliction of emotional distress, in this state, "no difference exists between negligent and intentional infliction of emotional distress claims in respect to the need for physical symptomatology." Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (R.I. 1996). Specifically, the Supreme Court has recognized "the right to recover damages by one who has been subjected to the intentional or the negligent infliction of mental distress as long as the distress [is] . . . accompanied by physical ills." Id. Mere "unsupported conclusory assertions of physical ills contained in the plaintiffs' complaint [are] insufficient" to successfully resist a defendant's motion for summary judgment. Id.
The materials before this Court do not add "any substantive meaning to the assertions made in the plaintiffs' complaint." Id. Further, although DCYF's fulfillment of its statutory responsibilities, including the care and protection of children separated from their natural families and the licensing and monitoring of child care providers pursuant to G.L. 1956 § 42-72-5(7)(b) and 42-72.1-1 et seq. respectively, may have caused plaintiffs some emotional stress, a claim of intentional infliction of emotional distress requires a showing of extreme and outrageous conduct. See Curtis v. State of Rhode Island, Dept. for Children and Their Families, 522 A.2d 203, 208 (R.I. 1987). In this Court's opinion, the plaintiffs have failed to demonstrate a genuine issue of material fact in this regard. Accordingly, plaintiffs fail to state a viable claim for intentional or negligent infliction of emotional distress.
 Conspiracy
The plaintiffs allege various conspiracy claims pursuant to G.L. 1956 § 11-1-6.[60] These include conspiracy to unlawfully revoke the foster-care license, to cover-up a CANTS' report and required acts, to defame character, to obstruct justice, and to violate plainitffs' civil rights. However, the DiBattistas' conspiracy-related claims are more properly framed as a civil conspiracy.
The tort of civil conspiracy exists in Rhode Island.[61] To establish a conspiracy in a civil case:
 "evidence must be produced for which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances any of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy. However, the doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient if the evidence is full, clear and satisfactory, and the conspiracy established by a preponderance of the evidence. This degree of proof, however, is necessary. The evidence must do more than raise a suspicion. It must lead to belief."
Stubbs v. Taft, 88 R.I. 462, 468, 149 A.2d 706, 708-09 (1959).
To prevail against the summary judgment on these claims, plaintiffs must provide competent evidence showing the existence of a material issue of fact. Specifically, essential to the DiBattistas' claim is evidence that the defendants knew of an unlawful enterprise. The plaintiffs' conspiracy claim regarding unlawful revocation of their foster-care license must fail because, according to the prior proceedings, the revocation was not unlawful. Further, the plaintiffs have not, in this Court's opinion, demonstrated beyond mere allegations that defendants knew of an unlawful enterprise and agreed to become a part of it regarding (i) a CANTS' report and required acts, (ii) defamation of plaintiffs' character or (iii) obstruction of justice. Accordingly, the defendants are entitled to summary judgment on these counts.
The plaintiffs also allege a conspiracy to interfere with their civil rights. "To state a claim under [42 U.S.C.A.] § 1985(3), a claimant must allege that a conspiracy was not only established to deprive the claimant of the equal protection and privileges and immunities of the law but also was predicated upon a racial or suspect class-based, invidiously discriminatory animus." Salisbury v. Stone, 518 A.2d 1355, 1361 (R.I. 1986) (citations omitted). In failing to allege that the defendants' acts constitute a conspiracy motivated by a racial or class-based animus, plaintiffs fail to state a claim under § 1985(3). Further, as the party opposing summary judgment, the plaintiffs have not carried their burden of proving by competent evidence the existence of a disputed material fact regarding a conspiracy to violate their civil rights. Accordingly, this claim fails as a matter of law.
For the foregoing reasons, defendants' motion for summary judgment is granted.
Counsel shall submit an appropriate order and judgment for entry.
[1] DiBattista v. State of Rhode Island, Department of Children, Youth Families, 717 A.2d 640, 640 (R.I. 1998) (order); Defs.' Ex. 1.
[2] The caption of the complaint in this matter names the "State of Rhode Island Department of Children, Youth Families, its agents, officials" as defendants (herein "defendants" or "DCYF"). However, within the body of the Complaint, plaintiffs make allegations about several individuals, including DCYF employees and two Family Court justices.
[3] Defs.' Ex. 1. The license was revoked effective immediately for behaviors "including alleged intimidation and threats directed at DCYF personnel and at plaintiffs' foster children, as well as denying DCYF access to plaintiffs' home." DiBattista, 717 A.2d at 640.
[4] Id.; Defs.' Exs. 2, 3, 3a.
[5] Defs.' Ex. 3a at 10.
[6] Section 8-10-3(e) of our General Laws provides, in relevant part: "The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years."
[7] DiBattista, 717 A.2d at 640; Defs.' Ex. 4b.
[8] DCYF moved the Family Court to dismiss the DiBattistas administrative appeal because they "failed to allege any statutory grounds upon which this Honorable Court may grant relief pursuant to the Rhode Island Administrative Procedures Act, R.I.G.L. § 42-35-1 et. seq." Defs.' Ex. 4. During the July 28, 1995 hearing, the Court stated, "The State says they moved to dismiss because you failed to allege any statutory grounds upon which this Honorable Court may grant — [sic]." Defs.' Ex. 4c at 8. The plaintiffs' complaint for judicial review in the Family Court, entitled "Complaint Appeal to Overturn Appeal Decision," articulates inter alia due process violations, including notice and hearing rights prior to revocation of foster parent license. Defs.' Ex. 4b at 4-5. During the hearing, Mr. DiBattista asserted various grounds for the appeal including prejudice, discrimination, religious discrimination, retaliation for filing a CANTS investigation, violation of DCYF protocols and procedures during the hearing, conspiracy, pre-hearing determination [on January 6, before the January 10 meeting] that the foster children would be withdrawn, illegal license revocation in violation of the "statute", 007. Defs.' Ex. 4c at 9, 13-15, 18, 22-23. The Court noted that the DiBattistas "filed an amended complaint" alleging religious discrimination, freedom of religion, malice, conspiracy, fraud and deceit, failure to report child abuse, prejudice and bias. Id. at 22-23.
[9] Defs.' Ex. 4c. "Based on those grounds, the Court is satisfied that you have not met the statutory requirement. The court, therefore, will grant the Department's motion to dismiss." Id. at 23.
[10] Id. "You may have an exception, and if you want a record, you can order the record and you can take an appeal of this decision." Id.
[11] Defs.' Ex. 5.
[12] Id.
[13] Id.
[14] Defs.' Ex. 6.
[15] Defs.' Suppl. Mem. Supp. Mot. Summ. J., Defs.' Ex. 2 at 21. During the November 8 hearing, the justice apparently accepted plaintiffs' amended complaint as a written brief. Id. at 23; Defs.' Ex. 7, Defs.' Ex. 8 at 28.
[16] DiBattista, 717 A.2d at 641; D. Suppl. Mem. Supp. Mot. Summ. J., Defs.' Ex. 3 at 2.
[17] Id. at 2, 4.
[18] Id. at 14-16. Plaintiffs, relying on A.J.C. Enterprises, Inc. v. Pastore, 473 A.2d 269 (R.I. 1984), stated "There is no obligation on the agency to transmit or send the record of the proceedings to the reviewing Court until the appealing party has paid for the cost of the transcript or has taken steps to ensure payment." Id. at 16. Mrs. DiBattista testified that they had paid $220 of a $663 cost for 221 pages of transcript. Id.
[19] Id. at 36-37. The justice stated, "59 is not the appropriate rule. Rule 60 is the appropriate one for relief from any order, but I am not finding that you come within any of the reasons under Rule 60B." Id. at 26-27. Subsequently, the justice stated:
 "At this point I am ruling, sir, and now you bring your motion to vacate that order. The Defendant is arguing under Rule 59. I think Rule 60 is also applicable, and I am finding that you have really alleged no grounds under any one of those rules to vacate the Chief Judge's order of July 28, and in addition, there was — no transcript filed, even though I understand you say you may have been mislead [sic], but the law is pretty clear that transcripts must be paid for by the Plaintiffs, and the Court's Order stands, and again no grounds have been shown to me under Rule 59 or 60 to change Chief Judge Jeremiah's order dismissing the complaint, so the complaint is dismissed. Your motion to vacate is denied at this time in addition to the motion to adjudge in contempt." Defs.' Ex. 8 at 36-37.
[20] Defs.' Ex. 8a. Said decree ordered:
 "1. That the plaintiff's motion to adjudge the defendant in contempt is denied.
 2. That the Court finds that Rule 60(b) is the appropriate rule regarding the vacating of a court order, and the Court does not find that this case falls within any of the exceptions enumerated in that rule.
 3. That the Court finds plaintiff has no right to vacate its order.
 4. That the plaintiff's motion to vacate the Court's order is denied." Id.
[21] Id.
[22] Id.
[23] Defs.' Ex. 9.
[24] Id.
[25] Defs.' Ex. 11 at 3.
[26] The decree ordered:
 "1. That the plaintiff's motion to adjudge the defendant in contempt is denied.
 2. That the Court finds that Rule 60(b) is the appropriate rule regarding the vacating of a court order, and the Court does not find that this case falls within any of the exceptions enumerated in that rule.
 3. That the Court finds plaintiff has no right to vacate its order pursuant to Rule 59(e) of the Rules of Domestic Relations Procedure.
 4. That the plaintiff's motion to vacate the Court's order is denied."
Defs.' Ex. 10 at 16-17. A second decree provided:
 "1. That the Plaintiff's Motion for Entry of Judgment in regard to the January 4, 1996, hearing before Mr. Justice Palombo is granted.
 2. That the Plaintiff's Motion for Entry of Judgment with respect to the July 29, 1995 [sic], and November 8, 1995, hearings is denied, as the decrees from those hearings have previously been entered.
 3. That the Plaintiff's Motion for Procurement of Documents is denied, although the Plaintiff may look at the Court file and any contents therein which the Chief Justice deems to be not confidential." Id. at 14-15.
[27] "Petition for Writ of Certiorari and Trial De Nova [sic]". Defs.' Ex. 10 at 1-9. Said appeal is DiBattista v. Department of Children Youth and Families, Rhode Island Supreme Court No. 98-0329.
[28] Defs.' Ex. 12.
[29] DiBattista, 717 A.2d at 641.
[30] Id.
[31] Id.
[32] Id. at 640.
[33] Id. at 642. "[T]he party seeking the benefit of res judicata has the burden to plead and prove the judgment upon which it relies." Id. (citing 18 Moore's Federal Practice, § 131.52[1] at 131-176 (3d ed. 1998)).
[34] Id. at 642.
[35] Id. (quoting Super. R. Civ. P. 12(c)). The Supreme Court refrained from addressing the judicial immunity defense and left it to the Superior Court on remand "to determine in the first instance whether any final judgment has been rendered by a court acting within its jurisdiction and then to address the issue of judicial immunity." Id. at 642 n. 5.
[36] The Court is aware that an amended complaint was filed after the filing of and hearing on the subject motion for summary judgment. The original complaint is superseded at the time of the filing of the amended complaint. See Grieco v. Perry, 697 A.2d 1108, 1110 (R.I. 1997).
[37] Specifically, the plaintiffs direct this Court to the following disputed facts:
 "1) Whereas DCYF claims that the DiBattistas were notified by telephone that concerns had been raised regarding their treatment of their foster children * * *, the DiBattistas dispute this. In fact, the DiBattistas were simply told that the meeting was to discuss the DiBattistas' complaint regarding Lee.
 2) Whereas DCYF claims that the DiBattistas' behavior was `abusive, intimidating and inappropriate' * * *, the DiBattistas dispute this. In fact, the DiBattistas agree that they were upset that the discussion at the meeting was an attack on them, and not about their complaint against Lee. However, they dispute DCYF's claim that their behavior in any way rose to a level that indicated that they `did not have the ability to control themselves in a mature manner.'
 3) The DiBattistas vehemently dispute that any reasonable person could conclude that their foster children were in imminent physical danger, based on their behavior at the January 9, 1995 meeting. The DiBattistas had enjoyed an exemplary record in caring for their four foster children in the years that preceded that meeting. In fact, the DiBattistas had decided to adopt two of the foster children in their care. When they arrived at the January 9, 1995 meeting, they were provoked and became upset as any decent and caring foster parents could be, to learn that their foster care license was at issue immediately after they had reported a DCYF social worker.
 4) The DiBattistas dispute DCYF's claim that their foster care license was revoked based on their alleged denial of access to a Key worker on December 29, 1994, and their behavior at the January 9, 1995 meeting. This was a pretext. Rather, the DiBattistas license was revoked in retaliation for their complaint of abuse against a DCYF social worker.
 5) The DiBattistas dispute that they received notice of the `Decree' which was purportedly entered on August 10, 1995 by the Rhode Island Family Court. In fact, the DiBattistas repeatedly checked the Family Court files subsequent to that date, wherein no signed Decree appeared in the Family Court file for several years. Significantly, DCYF acknowledges that although the Decree was signed by a Family Court judge on August 10, 1995, it was not received by the Clerk's office until twenty-nine days later, after the alleged appeal period had run, on September 8, 1995.
 6) The DiBattistas contend that the Family Court's decision to dismiss their appeal from the administrative hearings before DCYF, without the benefit of the transcript of the administrative hearings, was erroneous. However, insasmuch as no final `judgment' ever entered, there was no final decision from which they were able to appeal."
Pls.' Mem. Opp'n Defs.' Mot. Summ. J. at 13-15.
[38] Mem. Supp. Defs.' Mot. Summ. J. at 8.
[39] "The issue of revocation of a foster care [sic] license on the decision of the Acting Licensing Administrator is the proper subject of an appeal under policy #007, Section #2." Defs.' Ex. 3a at 1. According to the Hearing Officer, in addition to the license revocation, plaintiffs appealed the following actions: "Getting us to a meeting on January 9 under false pretenses; a conspiracy by Joann Jackson to cover-up our claim of emotional abuse against Maureen Lee towards Angelique Marcello; Children's CASA worker, Linda Zangari's neglect to acknowledge our grievances and never returned our phone call [sic] which were numerous; We were denied proper hearing process to hear our request for change of social worker due to irreconcilable differences between her and us and the children." Id. The final issue, plaintiffs' request for a change of social worker was "fully explored" during the administrative hearing, however, the Hearing Officer determined that "the change in social worker issue is effectively moot if the license revocation is not overturned." Id. at 3.
[40] During the July 28, 1995 hearing, Mr. DiBattista asserted: "How could we overnight go from exemplary foster parents who never, never had a charge against them and make a formal charge of child abuse and a CANTS investigator orders immediate psychiatric evaluation and my license is taken away the next day without a hearing? Now you want to throw me out." 7/28/95 Tr. at 15. "They couldn't take my license without a hearing, nor could they take the children of immediate danger [sic]" Id. at 17. "In fact, Your Honor, I can give you a document that shows as far as January 6 it had already been decided before January 10 that they were taking the kids. I was set up, as set up as can be." Id. at 22. "[W]e went to a CANTS investigation against the social worker. . . . They took my license the next day without a hearing and they took the children out of school without imminent danger. . . ." Id. at 6. "They gave me an appeal, where the appeals officer didn't follow a single protocol. They didn't allow me to call witnesses." Id. at 7. "What about Angie? The obstruction of justice of that girl, who the day before had a CANTS investigator tell her we're going to have a psychiatric evaluation. . . . [T]he very next day the police pick her up at school, never to say good-bye to her foster parents. . . ." Id. at 17. Plaintiffs' [amended] complaint included religious discrimination, freedom of religion, malice, conspiracy, fraud and deceit, failure to report child abuse, and prejudice and bias. Id. at 22-23.
[41] Defs.' Ex. 5. See Abbatematteo v. State of Rhode Island,694 A.2d 738, 740 (R.I. 1997) (Docket sheet shows entry date of a judgment containing a dated signature of the trial justice and undated signature of the clerk; date-stamp merely indicates when the document was filed in the clerk's office).
[42] See G.L. 1956 § 42-35-16 ("A party in interest, if aggrieved by a final judgment of the superior, family or district court rendered in proceedings brought under § 42-35-25, may, within twenty (20) days from the date of entry of the judgment, petition the supreme court of the state of Rhode Island for a writ of certiorari to review any question of law involved."). Subsection (a) of Rule 54, entitled Judgment-Costs, of the Family Court Rules of Procedure for Domestic Relations defines "judgment" as including a decree and any order from which an appeal lies."
[43] See G.L. 1956 § 42-35-16.
[44] See, e.g., Dept. of Corrections of the State of Rhode Island v. Tucker, 657 A.2d 546, 550 (R.I. 1995). Also see, e.g., Northeast Erector Ass'n v. Secretary of Labor, 62 F.3d 37, 39 (1st Cir. 1995) ("Different consequences flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the former, not being on the merits, is without res judicata effect.").
[45] See n. 26, supra.
[46] A motion under subdivision (b) of Rule 60 entitled, "Relief from judgment or order," does not affect the finality of a judgment or suspend its operation. See Pari v. Pari, 558 A.2d 632, 637 (R.I. 1989) (citations omitted) ("An appeal from an order denying a motion to vacate under Rule 60(b) presents the issue of correctness of that order. Such an appeal does not raise questions concerning the correctness of the judgment sought to be vacated. A motion to vacate a judgment is not a substitute for appeal, and its use to circumvent time limits on appeal has been disapproved.").
[47] Defs.' Ex. 12.
[48] See G.L. 1956 § 42-35-15(g)(1); Randall v. Norberg,121 R.I. 714, 721, 403 A.2d 240, 244 (1979).
[49] This Court is aware that the doctrine of judicial immunity protects judges from civil suits for damages based on actions taken in their official capacities. See Estate of Sherman v. Almeida, 747 A.2d 470, 473 (R.I. 2000). However, based on the foregoing, this Court need not apply the doctrine. Further, to the extent that the plaintiffs allege "judicial misconduct," this Court does not have jurisdiction over judicial misconduct claims. See G.L. 1956 § 8-16-1, et seq., Commission on Judicial Tenure and Discipline.
[50] See Plaintiffs' Complaint for Civil Rights Violations, Ist and IId Causes of Action.
[51] The plaintiffs also assert false dealing pursuant to G.L. 1956 §§ 11-18-1, 8 and 9, Defamation (Declaration of Policy) pursuant to G.L. 1956 § 11-53-1, fraud pursuant to G.L. 1956 §§ 11-18, 1, 8 and 9, and several conspiracy claims pursuant to G.L. 1956 § 11-1-6
which are all criminal offenses according to our statutes. Because criminal matters can only be initiated by duly authorized law enforcement officials, the plaintiffs' claims as such fail as a matter of law. See G.L. 1956, § 12-5-1, et seq. Apparently, the plaintiffs' claims were referred to the Office of the Attorney General for investigation.
[52] Pls.' Compl., IId Cause of Action, ¶ 8 at 2.
[53] Pls.' Compl., IVth Cause of Action, ¶ 17 at 5.
[54] Pls.' Compl., IVth Cause of Action, ¶ 19 at 5.
[55] See G. L. 1956 §§ 42-73-8 regarding the Child Advocate Office's access to information pertaining to children in programs under the jurisdiction of DCYF.
[56] Pls.' Compl., IVth Cause of Action, ¶ 17 at 5.
[57] Pls.' Compl., XVIIIth Cause of Action, ¶ 93 at 25.
[58] Pls.' Compl., XIXth Cause of Action, ¶ 98 at 27.
[59] Pls.' Compl., XIXth Cause of Action, ¶ 102 at 27.
[60] See n. 50, supra.
[61] See ERI Max Entertainment, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I. 1997).